Commonwealth, Appellant, *v.* McCloskey.

118

Argued December 1, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused June 14, 1971.

*Arlen Specter,* District Attorney, with him *James D. Crawford,* Deputy District Attorney, and *John Rogers Carroll,* Special Assistant District Attorney, for Commonwealth, appellant.

*Howard Gittis,* with him *Steven A. Arbittier,* and *Wolf, Block, Schorr* and *Solis-Cohen,* for appellees.

*Thomas J. Mullaney* and *John T. Clary,* for appellee.

*James Francis Lawler,* with him *Ostroff & Lawler,* for appellee.

*Henry T. Reath,* with him *Robert L. Pratter* and *Duane, Morris & Heckscher,* for appellee.

*Jacob Kalish,* with him *Louis M. Natali, Jr.,* and *Dilworth, Paxson, Kalish & Levy,* for appellee.

*John Patrick Walsh, David N. Savitt* and *Walsh and Savitt,* for appellee.

*Donald J. Goldberg,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, May 13, 1971:

The Commonwealth here appeals from decisions by an evenly divided Superior Court[1] affirming various orders of the Philadelphia Court of Common Pleas

---

[1] *Commonwealth v. Blatstein,* 217 Pa. Superior Ct. 788, 269 A. 2d 151 (1970); *Commonwealth v. H. H. Robertson Company,* 217 Pa. Superior Ct. 789, 269 A. 2d 367 (1970); *Commonwealth v. McCloskey,* 217 Pa. Superior Ct. 789 269 A. 2d 151 (1970); *Commonwealth v. McCloskey Construction Company,* 217 Pa. Superior Ct. 790, 269 A. 2d 367 (1970); *Commonwealth v. McCormick Taylor Associates,* 217 Pa. Superior Ct. 790, 269 A. 2d 152 (1970); *Commonwealth v. Marzullo,* 217 Pa. Superior Ct. 791, 269 A. 2d 152 (1970); *Commonwealth v. Steinberg,* 217 Pa. Superior Ct. 791, 269 A. 2d 146 (1970); *Commonwealth v. Taylor,* 217 Pa. Superior Ct. 792, 269 A. 2d 146 (1970).

quashing indictments against and suppressing evidence obtained from the several defendants. This complex appeal involves numerous issues, all of which center on two problems: (1) whether a criminal proceeding can lawfully be commenced by an investigating grand jury's presentment to an indicting grand jury without affording defendant an opportunity for a preliminary hearing; and (2) whether, or to what degree, a subpoenaed witness and potential defendant before an investigating grand jury is entitled to the assistance of counsel to aid him in asserting his right against self incrimination guaranteed both by the Fifth Amendment, applied to the states through the Fourteenth Amendment, and Article I, Section 9 of the Pennsylvania Constitution.

As to the former issue, we believe that an indictment based upon an investigating grand jury's presentment directly to an indicting grand jury with leave of court is lawful, even though no preliminary hearing was held. Concerning the assistance of counsel and the right against self incrimination, while we do not today hold that a witness is entitled to have counsel present in the hearing room or that he is entitled to step outside the door and consult with counsel after every question, we do believe that a witness should receive a warning by the court in charge of the investigating grand jury that if the witness is confused or believes his answer might be incriminating, he may come before the court accompanied by counsel and be advised of his rights. This procedure was not followed with reference to certain of the individual appellees now before us. Accordingly, those indictments in any way based upon a defendant's own testimony given without this warning and in violation of his right against self incrimination must be quashed.

## I. BACKGROUND

The investigating grand jury of April Term, 1969, was convened by court order pursuant to a petition

submitted by the Philadelphia District Attorney alleging various offenses were being or had been committed with respect to housing, urban renewal and public construction.

### a.   Frank M. Steinberg

After hearing numerous witnesses and receiving voluminous evidence, the investigating grand jury returned a presentment[2] on August 18, 1969, requesting that appellee, Frank M. Steinberg, a former Chairman of the Philadelphia Housing Authority, be indicted on several counts.

The court in charge of the investigating grand jury (SLOANE, J.) accepted the presentment, and the district attorney with leave of court then submitted the recommendations to the September indicting grand jury, which returned true bills against appellee Steinberg charging him with malfeasance, misfeasance and nonfeasance in office; conspiracy; deposit of public money for gains; violation of the State Adverse Interest Act; practice of corrupt solicitation; and corrupt solicitation.[3] All these indictments were returned without any complaint having been issued or any preliminary arraignment or preliminary hearing having been held.

Appellee filed several pre-trial motions challenging his indictments, all of which were argued during the week of June 22, 1970, when similar motions by the other appellees in this case were also being heard. Steinberg's motion to quash was granted on the basis that he had been deprived of his right to a preliminary hearing, and hence his motions for suppression of evidence, pre-trial discovery and severance were dismissed as moot by the court (SPAETH, J.). The Commonwealth appealed from the granting of the motion, and the Superior Court affirmed by an evenly divided court.[4]

---

[2] The "second" presentment.

[3] The charges were embodied in Bills Nos. 879-90, 892-97.

[4] See note 1, supra.

### b. The Stadium Cases

The same April, 1969, investigating grand jury returned a separate presentment[5] on September 4, 1969, recommending indictments against the other appellees on various charges relating to the construction of an all purpose municipal sports stadium in Philadelphia costing approximately $50,000,000. The court (SLOANE, J.) accepted the presentment.

Defendant Thomas Taylor, the district manager of H. H. Robertson Company, the steel subcontractors for the stadium, petitioned the court in charge of the investigating grand jury to grant him a preliminary hearing. His petition was denied, and his appeal to the Superior Court was quashed.

Then, on October 1, 1969, defendant H. H. Robertson Company itself filed a petition before the court in charge of the October, 1969, indicting grand jury (SPAETH, J.) seeking to restrain the district attorney from presenting the investigating grand jury's recommendations to the indicting grand jury until a preliminary hearing had been held, or else until certain conditions had been imposed on the manner in which the evidence was to be presented to the indicting grand jury. Defendants McCloskey and Company, Inc., the general contractor for the stadium, and James C. McCloskey, the firm's executive vice president, filed similar petitions on October 3, 1969, and defendants Paul Marzullo, Director of Architecture and Engineering for Philadelphia, and Harry Blatstein, the stadium coordinator, did likewise on October 6, 1969.

On October 24, 1969, Judge SPAETH entered an order dismissing defendants' petitions, setting forth his reasons for his action in an opinion, *In re Petition of H. H. Robertson Company*, September Term, 1969, Miscellaneous No. 7540. The district attorney then present-

---

[5] The "fourth" presentment.

ed evidence[6] against the stadium defendants to the October indicting grand jury, which returned the following bills: charges of false pretenses and conspiracy against James C. McCloskey; charges of false pretenses and conspiracy against McCloskey and Company, Inc.;[7] charges of conspiracy against McCormick-Taylor Associates, engineering consultants to the stadium architect; charges of conspiracy against Thomas Taylor; charges of bribery of government offices and employees, bribery of servants and employees, extortion, and malfeasance, misfeasance and nonfeasance in office against Harry Blatstein; charges of malfeasance, misfeasance, and nonfeasance in office and conspiracy against Paul J. Marzullo; and charges of conspiracy against H. H. Robertson.[8] The district attorney also submitted a consolidated bill based on the same September presentment to the January, 1970, indicting grand jury, which returned a true bill[9] charging Thomas Taylor, H. H. Robertson Company, McCormick-Taylor Associates, McCloskey & Company, Inc., James McCloskey and Paul Marzullo with conspiracy to obtain money by false pretenses from the City of Philadelphia. None of the above indictments were preceded by either a complaint, preliminary arraignment, or preliminary hearing.

The President Judge of the Philadelphia Court of Common Pleas[10] assigned all the foregoing cases to Judge SPAETH "for all pre-trial and post-trial motions

---

[6] It has been stipulated that this evidence consisted of the "fourth" presentment.

[7] Although the indictment was against "McCloskey Construction Company", we will refer to this defendant by its proper name, "McCloskey & Company, Inc."

[8] All these charges were embodied in Bills Nos. 2416-21, 2674-78, and 2723-24.

[9] Bill No. 266.

[10] The late Hon. VINCENT A. CARROLL.

and trial." Various pre-trial motions requesting, inter alia, the suppression of evidence, the quashing of indictments, and severance were filed, and arguments were heard during the week of June 22, 1970.[11]

---

[11] The following pre-trial motions were filed:

"1. *Motions to suppress testimony*
Filed by:
Paul Marzullo
James McCloskey
Thomas Taylor

"2. *Motion to quash indictments as based on unconstitutionally obtained testimony*
Filed by:
James McCloskey

"3. *Motions to quash indictments as defective for denial of a preliminary hearing*
Filed by:
Harry Blatstein
Paul Marzullo
McCloskey & Company, Inc.
James McCloskey
McCormick-Taylor Associates
H. H. Robertson Company
Thomas Taylor

"4. *Motions for change of venue* (withdrawn during argument)
Filed by:
Paul Marzullo
McCormick-Taylor Associates
Thomas Taylor

"5. *Motions for continuance until the Investigating Grand Jury is discharged*
Filed by:
Paul Marzullo
McCloskey & Company, Inc.
James McCloskey
H. H. Robertson Company
Thomas Taylor

"6. *Motions for continuance until the completion of the stadium*
Filed by:
Paul Marzullo
H. H. Robertson Company
Thomas Taylor

On July 27, 1970, in a departure from his October 24, 1969, decision, Judge SPAETH filed four opinions grant-

"7. *Motions for discovery and for production of scientific reports*
   Filed by:
   McCloskey & Company, Inc.
   James McCloskey
   McCormick-Taylor Associates
"8. *Motions for bill of particulars*
   Filed by:
   Harry Blatstein
   Paul Marzullo
   McCloskey & Company, Inc.
   James McCloskey
   Thomas Taylor
"9. *Motion for consolidation of all bills*
   Filed by:
   Commonwealth of Pennsylvania
"10. *Motions for severance*
   Filed by:
   Paul Marzullo
   McCloskey & Company, Inc.
   James McCloskey
   H. H. Robertson Company
   Thomas Taylor
"11. *Motions in re order of proof*
   Filed by:
   McCloskey & Company, Inc.
   James McCloskey
   H. H. Robertson Company
"12. *Motions to quash superseded indictments*
   Filed by:
   McCloskey & Company, Inc.
   James McCloskey
   McCormick-Taylor Associates
   Thomas Taylor
"13. *Motions for inspection of grand jury notes of testimony*
   Filed by:
   Harry Blatstein
   Paul Marzullo
   McCloskey & Company, Inc.
   James McCloskey
   H. H. Robertson Company
   Thomas Taylor

ing the motions to quash and to suppress testimony of certain defendants. As to all the stadium defendants, Judge SPAETH concluded that in light of the intervening decision of this court in *Commonwealth v. Rose* and *Commonwealth ex rel. Magaziner v. Sheriff,* 437 Pa. 30, 261 A. 2d 586 (1970), the Pennsylvania Rules of Criminal Procedure now required a preliminary hearing in every criminal case. He therefore determined that the teaching of the recent decision of the United States Supreme Court in *Coleman v. Alabama,* 399 U.S. 1, 90 S. Ct. 1999 (1970) as well as considerations of equal protection and the defendants' right to counsel necessitated the indictments be quashed.

In a separate opinion dealing with defendant James McCloskey's petition to quash, Judge SPAETH ruled invalid an indictment based in part on testimony obtained in violation of a defendant's rights under the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. In another separate opinion, Judge SPAETH directed that the testimony of defendants James McCloskey, Paul Marzullo and Thomas Taylor before the April, 1969, investigating grand jury be supressed because their Sixth Amendment right to effective assistance of counsel at a critical stage had been denied. Finally, as noted above,[12] Judge SPAETH quashed the indictment with respect to Frank Steinberg.

The Commonwealth appealed these decisions to the Superior Court which affirmed them all without opinion

---

"14. *Application for a blue ribbon jury*
Filed by:
Thomas Taylor"

[12] See page 121, supra. The Steinberg indictment was not involved in Judge SPAETH's October, 1969, opinion. There was accordingly no change with respect to this appellee.

by an equally divided court on September 25, 1970.[13] This consolidated appeal followed.[14]

## II. NECESSITY OF A PRELIMINARY HEARING

### a. Rules of Criminal Procedure

Appellees urge that their indictments are invalid because they violate the Pennsylvania Rules of Criminal Procedure which, in their view, establish a comprehensive procedure for the institution of all criminal prosecutions.

Rule 102 provides that "[e]xcept as otherwise provided in these rules, all proceedings shall be initiated by a written complaint, sworn to or affirmed, and subscribed by affiant."[15] Rule 116 requires that a prelim-

---

[13] See note 1, supra.

[14] Meanwhile, the Commonwealth proceeded against defendants McCloskey and Company, Inc., McCormick-Taylor Associates, H. H. Robertson Company, Paul Marzullo and James C. McCloskey by way of complaint, preliminary arraignment and preliminary hearing. Complaints were presented to the Muncipal Court (DANDRIDGE, J.) A dispute arose as to whether the preliminary hearing should proceed before Judge DANDRIDGE, as the district attorney desired, or before Judge SPAETH, as ordered by the late Hon. VINCENT A. CARROLL. Defendants petitioned this Court for a writ of prohibition and on September 15, 1970, we issued a rule calling upon Judge DANDRIDGE and President Judge JOSEPH R. GLANCEY of the Municipal Court of Philadelphia to show cause why the writ should not be granted. The rule isued without prejudice to preliminary hearings held in the meantime. On September 23, 1970, we granted defendants' petition for a writ of prohibition and the complaints were then transferred to Judge SPAETH for disposition. On September 28, 1970, a pre-hearing conference was held. Upon motion of the district attorney and over defendants' objections, the court on November 30, 1970, continued the preliminary hearing, explaining in an accompanying opinion that it did not wish to take any action which might interfere with this Court's disposition of this appeal.

[15] Rule 102 was subsequently amended effective May 1, 1970, to provide that a complaint is only one of several permissible methods of instituting criminal proceedings. However, the present appeal is governed by the former rules.

inary arraignment be held without "unnecessary delay" after an arrest, at which time the accused is entitled to a warning of his right to counsel and to bail, if he is accused of a bailable offense, as well as to his "right to have a preliminary hearing, or, except as provided in these rules, to waive it."[16] Rules 117 to 119 respectively deal with the nature and place of a preliminary hearing, the publicity and recording of the hearing, and the rights of parties at a preliminary hearing.

The issue, simply stated, is whether these Rules of Criminal Procedure have abrogated the power of a prosecuting official to submit an investigating grand jury presentment directly, with leave of court, to an indicting grand jury, a power which was a traditional and established exception to the normal procedure of instituting criminal proceedings by criminal complaint and preliminary hearing.[17]

As noted above, Rule 102 provided that all proceedings should be initiated by criminal complaint "[e]xcept as otherwise provided in these rules . . ." The Commonwealth submits that Rule 212(c)'s definition of "presentment" as ". . . a formal accusation made by a grand jury, drafted by the Commonwealth's attorney with leave of court and submitted for action to a subsequent indicting grand jury", is such an exception to Rule 102.

In his October, 1969, opinion Judge SPAETH accepted the Commonwealth's view of the Rules. The principal reason for altering his view on this issue in the July, 1970, determination, was his reading of the opinion of this Court in *Commonwealth v. Rose* and *Commonwealth ex rel. Magaziner v. Sheriff,* supra.

Initially we note that while Judge SPAETH may have been understandably misled by *Rose* and *Magaziner,*

---

[16] Rules 116, 117, 118, and 119 have likewise been revised.

[17] See pp. 130-131, infra.

that decision is not determinative of the issue now before us. *Rose* and *Magaziner* involved situations where a trial judge in one case, and a habeas corpus hearing judge in the other sat as committing magistrates and summarily held defendants on charges of perjury, with no complaint having been issued or preliminary hearing having been held. No such situation is now before us.

No challenge to a grand jury presentment or the powers of a special investigating grand jury existed in *Rose* and *Magaziner*. Furthermore, the opinion's language concerning the Rules of Criminal Procedure stressed that the Rules applied to common pleas judges sitting as committing magistrates. The opinion was limited to that factual situation. This Court in no way there settled the question of whether the criminal rules pertaining to complaint and preliminary hearing superseded the other historical methods of commencing criminal prosecutions.

While the Rules are silent on special grand jury functions, we agree with the Commonwealth that Rule 212(c) provides a sufficient exception to Rule 102 to permit the interpretation we enunciate today.

Moreover, even in the absence of Rule 212(c), we would not infer that such silence was intended to abolish the traditionally sanctioned procedure by which a court-supervised investigating grand jury makes its presentment. It would be unreasonable to infer such a drastic alteration, as urged by appellees, from mere silence in rules dealing with more commonplace criminal proceedings. The Rules of Criminal Procedure at present simply do not concern themselves with this long established practice, nor do they foreclose any of the other traditional exceptions[18] to proceeding by a preliminary hearing.

---

[18] See pp. 130-131, infra.

### b. Constitutionality of an Investigating Grand Jury Presentment

Several of the appellees here advance the argument that to deny them a preliminary hearing in contradistinction to defendants whose prosecutions began with complaints is an invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment. A review and analysis of the traditional and historic methods for instituting criminal proceedings in this Commonwealth discloses that this contention is without merit.

In the overwhelming majority of cases a criminal action commences with the appropriate prosecuting official's filing of a complaint.[19] Preliminary arraignment and a preliminary hearing[20] follow. This procedure, which can certainly be viewed as the norm, admitted of exceptions in three general situations.

The first is where the district attorney or attorney general submits a bill to a grand jury without previous binding over or commitment of the accused. Such an exercise of official authority would be justified, for example, when the accused has fled or is about to flee the jurisdiction, and great haste is necessary. "The procedure in such cases, however, is under supervision of the court, and if the process and power is misapplied the court will vindicate itself in restraining its exercise." *Commonwealth v. Green*, 126 Pa. 531, 537, 17 Atl.

---

[19] See generally, Address by the Hon. JOHN C. BELL, District Attorney of Philadelphia, "The Several Modes of Instituting Criminal Proceedings in Pennsylvania," 13 Pa. Dist. Repts. 815 (1904).

[20] It is interesting to note that preliminary hearings were unknown at early common law. They were created by statute and originated not as a means of protecting persons arrested for crime but rather as an instrument to restrict their indiscriminate release. For a thorough history of the development of preliminary hearings in both England and this Commonwealth, see *Commonwealth v. O'Brien*, 181 Pa. Superior Ct. 382, 387-97, 124 A. 2d 666, 669-73 (1956).

878, 879 (1889). Accord, *McNair's Petition*, 324 Pa. 48, 59-60, 187 Atl. 498, 503-04 (1936) and cases cited therein. See also, *Commonwealth v. Coyle*, 415 Pa. 379, 396, 203 A. 2d 782, 790-91 (1964).

The second exception is when an indicting grand jury makes a presentment based on personal knowledge of the jurors without any bill of indictment having been laid before them. See *McNair's Petition*, supra, at 60, 187 Atl. at 504; *Commonwealth v. Green*, supra, at 537-38, 17 Atl. at 879. See generally 4 Wharton, Criminal Law and Procedure §1710 (1957).

We are here concerned with the final exception— a prosecutor's submission of an investigating grand jury presentment to an indicting grand jury with leave of court. Appellees contend the recent decision of the United States Supreme Court in *Coleman v. Alabama*, supra, while not requiring a preliminary hearing as a matter of constitutional law, holds that if a preliminary hearing is granted it becomes a critical stage in the proceedings, and the accused is accordingly entitled to the assistance of counsel. They further assert that because *Coleman* emphasizes the critical nature of the preliminary hearing, a procedure whereby some criminal prosecutions are initiated by hearing and others by investigating grand jury presentments raises a serious question of equal protection, for in effect two types of defendants have been created: those entitled to a preliminary hearing and those not entitled to such a proceeding. Appellees urge that such a classification is unreasonable and arbitrary because it permits a district attorney to create a classification at will, uninhibited by guidelines or restrictions.

We do not agree that these alternative modes of instituting criminal proceedings as they exist in this Commonwealth constitute an unreasonable classification. This Court has elsewhere summarized the origins of a grand jury's investigative powers, which have been

recognized in this Commonwealth since 1791.[21] It suffices to recall that while in some states a grand jury's inquisitorial capacity is virtually unlimited,[22] in Penn-

---

[21] See generally, *Hamilton's Appeal*, 407 Pa. 366, 383-86, 180 A. 2d 782, 790-91 (1962) (dissenting opinion) ; *McNair's Petition*, 324 Pa. 48, 56 n. 1, 187 Atl. 498, 502 n. 1 (1936).

Although the origins of the grand jury continue to be obscure, compare *McNair's Petition*, supra (Norman or Anglo-Saxon) with Whyte, Is the Grand Jury Necessary, 45 Va. L. Rev. 461, 462-63 (1959) (Greco-Roman or Scandinavian), there is general agreement that the institution first became formalized in England in 1162 by the Assize of Clarendon. See generally, Edwards, The Grand Jury 1-44 (1906) ; Plucknett, A Concise History of the Common Law, 16-19, 86-88, 102-21 (3d ed. 1940) ; 1 Pollock & Maitland, The History of the English Law 136-53, 598-662 (2d ed. 1903) ; Stephen, A History of the Criminal Law of England 184-86, 250-58 (1883).

The assize was a body of laymen who were to report persons accused of robbery and other crimes to the royal sheriff. Their deliberations were open, and their purpose was to further the interest of the crown.

Then, in the seventeenth century, the grand jury became a protector of the individual against the crown. The single most significant manifestation of this change was the Earl of Shaftesbury's Trial, 8 How. St. Tr. 759 (1681) where the jurors requested and were permitted to question the witnesses in private. They then refused to indict. See 8 Wigmore on Evidence, §2360 (1961) ; see generally Calkins, Grand Jury Secrecy, 63 Mich. L. Rev. 455, 456-58 (1965). The function of protecting the individual from indiscriminate prosecution remains the foremost duty of the grand jury today.

The origins of the grand jury's investigative powers are equally uncertain. See Dession and Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L.J. 687 (1932) ; Segal, Spivack and Costilo, Obtaining a Grand Jury Investigation in Pennsylvania, 35 Temp. L.Q. 73, 75 (1961). Yet, its inquisitorial powers were clearly established in this Commonwealth by 1791. See *McNair's Petition*, supra at 57, 187 Atl. at 503.

[22] See *McNair's Petition*, supra, 324 at 57-58, 187 Atl. at 503. See generally Kuh, The Grand Jury "Presentment": Foul Blow or Fair Play? 55 Col. L. Rev. 1103 (1955) ; Note, The Grand Jury as an Investigatory Body, 74 Harv. L. Rev. 590 (1961) ; Note, Discretionary Power in the Judiciary to Organize a Special Investigating Grand Jury, 111 U. Pa. L. Rev. 954 (1963).

sylvania the freedom of the grand jury to investigate has been severely restricted. Hence we believe any fears of arbitrary action by district attorneys in this area are not supported by either the decisional law or the requisite procedure.

One of the earliest and most comprehensive discussions of a grand jury was *Lloyd & Carpenter's Case,* 5 Pa. L.J. 55, 3 Clark 188 (Ct. of Qtr. Sess. of Phila. 1845), cited with approval by this Court on many occasions.[23] After commenting on the other two extraordinary modes of procedure,[24] Judge KING there observed that an investigating grand jury is justified where criminal courts direct the investigation of: ". . . matters of general public import, which, from their nature and operation in the entire community, justify such intervention. The action of the courts on such occasions, rather bear on things than persons; the object being the suppression of general and public evils, affecting in their influence and operation communities rather than individuals and therefore, more properly the subject of general than special complaint. Such as great riots that shake the social fabric, carrying terror and dismay among the citizens; general public nuisances affecting the public health and comfort; multiplied and flagrant vices tending to debauch and corrupt the public morals, and the like. In such cases the courts may properly, in aid of inquiries directed by them, summon, swear, and send before the grand jury, such witnesses as they may deem necessary to a full investigation of the evils intimated, in order to enable the grand jury to present the offence and the offenders. But this course is never adopted in case of ordinary crimes, charged against

---

[23] See, e.g., *Special Grand Jury Case,* 397 Pa. 254, 256, 154 A. 2d 592, 594 (1959) ; *McNair's Petition,* supra at 58, 187 Atl. at 503.

[24] See discussion, supra, pp. 130-131.

individuals. Because it would involve, to a certain extent, the expression of opinion by anticipation, on facts subsequently to come before the courts for direct judgment; and because such cases present none of those urgent necessities which authorize a departure from the ordinary course of justice. In directing any of these investigations, *the court* act [sic] under their official responsibilities and must answer for any step taken, not justified by the proper exercise of a sound judicial discretion." Id. at 58-59, 3 Clark at 192 (emphasis added).

We have stressed with regard to a grand jury's investigative function that ". . . '. . . this power, which is a most delicate one, is never exercised unless under urgent necessity or . . . [where] the public would suffer from delays incident to ordinary forms of law.'" *McNair's Petition*, supra at 60, 187 Atl. at 504 (brackets in original) (citations omitted). Such concerns were the prime motivation underlying the historic requirement in Pennsylvania that *a court* be placed in charge of a special investigating grand jury to regulate the scope of inquiry, by, for example, administering the oath to the witnesses and receiving objections.[25]

A court will first scrutinize the prosecuting official's petition for summoning the jury. See, e.g., *In re Grand Jury Investigation of Registration Commission*, etc., 22 Pa. D. & C. 2d 285 (1960); *District Attorney's Petition*, 50 Pa. C.C. 347 (1921); *In re Alleged Extortion Cases*, 29 Pa. C.C. 538 (1904).

The court's decision to proceed with, as well as its overseeing of the investigation is subject to the review of this Court through the recognized procedure of applying for a writ of prohibition to prevent an alleged im-

---

[25] The foreman of an investigating grand jury does not have the power to administer the oath. See *Commonwealth v. Hubbs*, 137 Pa. Superior Ct. 229, 8 A. 2d 611 (1939).

proper exercise of power or an abuse of discretion by the supervising court. See *Hamilton Appeal*, 407 Pa. 366, 180 A. 2d 782 (1962). We have not hesitated to issue a writ of prohibition in cases where evidence did not indicate a special grand jury was necessary. Compare *Philadelphia County Grand Jury Investigation Case*, 347 Pa. 316, 32 A. 2d 199 (1943) (writ of prohibition issued) and *McNair's Petition*, supra (writ of prohibition issued) with *Dauphin County Grand Jury Investigation (No. 1)*, 332 Pa. 289, 2 A. 2d 783 (1938) (investigation approved) and *Shenker v. Harr*, 332 Pa. 382, 2 A. 2d 298 (1938) (investigation approved). See generally *Hamilton Appeal*, supra at 376-81, 180 A. 2d at 787-89 (1962) (appendix attached to concurring opinion listing Pennsylvania grand jury cases).

Moreover, we note that a writ of prohibition is not the only method by which our Court will review the propriety of the convening and functioning of an investigating grand jury. A convicted defendant who believes he has been aggrieved by any illegal actions of the investigating grand jury could obtain appropriate appellate review in his appeal from judgment of sentence.

In *McNair's Petition* we set forth some of the more crucial requirements surrounding the approval of a grand jury investigation: "A grand jury investigation, because of the gravity of the undertaking, must have a definite purpose to discover criminal acts which seriously affect or injure the public generally, which effect, if permitted to continue, would endanger public safety . . . or health, demoralize the personal security of members of the public, or permit systematic criminal depredations by public officers. . . . Such matters require immediate attention so that these evils may be suppressed. The criminal acts subject to investigation must be such that the ordinary process of the law is inadequate to cope with or discover them. . . .

"A grand jury's investigation cannot be a blanket inquiry to bring to light supposed grievances or wrongs for the purpose of criticizing an officer or a department of government, nor may it be instituted without direct knowledge or knowledge gained from trustworthy information that criminal conspiracy, systematic violations of the law or other criminal acts of a widespread nature prevail, and at least one or more cognate offenses should exist on which to base a general investigation. The investigation cannot be aimed at individuals primarily, as such, nor at the commission of ordinary crimes . . . but should be of matters or criminal nature wherein public officers or the interests of the general public are involved.

"Where it is made to appear to a court, as above indicated, that there exists a system of crime among public officers, or criminal conspiracies respecting public business, safety or health, or other criminal acts affecting these functions of a widespread nature, jeopardizing or demoralizing public security or health, the judge may properly order such investigation.

"Investigations for purely speculative purposes are odious and oppressive and should not be tolerated by law. . . . The grand jury must know what crimes it is to investigate. The court of quarter sessions has no power to set such an inquiry in motion unless it has reasonable cause to believe that an investigation will disclose some criminal misconduct which is within its jurisdiction to punish.

"The grand jury must not be set upon fruitless searches, founded upon mere rumor, suspicion or conjecture. These are proper matters for police investigation. Before reflection is cast upon the integrity of public officials a preliminary investigation by the forces of law charged with the discovery of crime should be made to determine whether there is any real foundation. Such jury investigations involve great expense to

the public; subject the citizen to inconvenience and frequently interfere with the normal functioning of public officials and bodies brought before it. They throw a cloud of suspicion upon the parties subject to attack and undermine public confidence in them. There must be a sound, solid basis on which to proceed." Id. at 60-62, 187 Atl. at 504-05 (footnote and citations omitted).

Having reviewed in depth the nature and characteristics of an investigating grand jury, we believe it serves identifiable and legitimate state interests. We cannot agree that the omission of a preliminary hearing for a defendant indicted pursuant to a presentment, when the extraordinary and limited circumstances[26] justifying the impaneling of an investigating grand jury existed, in any way prejudices him, or denies him a greater degree of protection than is available to a defendant in a criminal proceeding instituted by complaint and preliminary hearing. In comparing the safeguards afforded by these alternative procedures, we must turn again to the Rules of Criminal Procedure.

Rule 119[27] lists four rights of an accused at a preliminary hearing: assistance of counsel, cross-examina-

---

[26] It has been suggested that the minimum requisites for obtaining a grand jury investigation are: (a) the subject matter of the investigation must affect the members of the community as a whole, rather than as individuals; (b) the investigation must be aimed at conditions and not primarily at individuals; (c) the ordinary processes of the law must be inadequate to cope with the problems; (d) the investigation must have a defined scope, be aimed at crimes, and supported by information indicating the existence of a system of related crimes or a widespread conspiracy; (e) information as to the crimes must come from direct knowledge or a trustworthy source. See Segal, Spivack and Costilo, supra, note 21 at 79.

[27] Rule 120 of the new Rules. It is not without interest that the rules pertaining to preliminary arraignment and preliminary hearing mention that these procedures occur after *an arrest*. To our knowledge, no arrest has occurred in the instant cases.

tion of witnesses and inspection of physical evidence, giving of testimony and recording the proceedings at his own expense.

We deal with the right to counsel in Section III of this opinion and accordingly defer a discussion of that subject.

As to recording the proceedings, a record was made of the special grand jury investigation here involved. Each witness is entitled to his own testimony. Furthermore, should any of the other evidence before the investigating grand jury be material to the impeachment of Commonwealth witnesses at trial, we will not presuppose that the trial court would not adequately protect any rights a defendant might have to utilize such evidence.[28]

Likewise, the other preliminary hearing advantages allegedly denied defendants are illusory. In *Commonwealth v. Dessus*, 423 Pa. 177, 181, 224 A. 2d 188, 191 (1966), we held that an indictment based solely on hearsay testimony was valid. That being the case, an accused's opportunity to cross-examine at a preliminary hearing is severely restricted. We believe that the policy considerations justifying the impaneling of a special investigating grand jury when ordinary law enforcement procedures are no longer capable of dealing with the problem as outlined above justifies this "curtailment", if indeed it is one, of an accused's cross-examination opportunity. Cf. *California v. Green*, 399 U.S. 149, 90 S. Ct. 1930 (1970).

Additionally, in view of the limited quantum of evidence necessary to bind a defendant over, and a defendant's opportunity to testify on his own behalf, we believe any disclosure benefits available to a defendant in a preliminary hearing through the availability of in-

---

[28] Cf. *Pittsburgh Plate Glass Co. v. U. S.*, 360 U.S. 395, 79 S. Ct. 1237 (1959) ; see generally, Calkins, supra, note 21 at 476-85.

specting the minimum if any, amount of physical evidence introduced by the Commonwealth are more than adequately balanced in the context of an indictment arising out of a grand jury investigation. In the latter situation, a defendant has the entire presentment as a basis upon which to prepare for trial as well as the right to request a bill of particulars under Rule 221. As the record now before us discloses, a presentment is a rather complete summary of the grounds on which the investigating grand jury is making its recommendation, and includes descriptions of both the physical evidence and testimony that prompts its action.

It has been urged by various appellees that the proper procedure required by both the criminal rules and considerations of equal protection is that subsequent to the investigating grand jury presentment, a complaint should be issued and preliminary hearing held before the matter is submitted to an indicting grand jury. To accede to appellee's request would merely be subjecting the administration of criminal justice to another superfluous layer of delay and imposing an unwise burden upon our judicial process as well as upon the prosecutor and counsel for the defense with only a slight expectation for what at most would be a highly speculative *de minimis* advantage to an accused.

We reiterate that an investigating grand jury is an arm of the court, in this Commonwealth is judicially supervised from its inception contrary to the practice in most jurisdictions and is strictly regulated in the scope of its inquiry. The rights of an accused will certainly be as well protected before an investigating grand jury as during a preliminary hearing. Both are conducted before persons not necessarily schooled in the law. At least in the investigating grand jury context, the procedure is subject to supervision by a court.

Finally, we do not view *Coleman v. Alabama,* supra, as compelling a different result. *Coleman* did not decide

that a preliminary hearing was constitutionally required; it held that when an accused has a preliminary hearing, he is entitled to counsel. This Court has ruled *Coleman* to be non-retroactive in *Commonwealth v. James*, 440 Pa. 205, 269 A. 2d 898 (1970). Moreover, *Coleman* made clear that appellate review of the denial of counsel at a preliminary hearing was subject to the harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967). 399 U.S. at 3, 90 S. Ct. at 2004. As will appear more fully below, we apply an analogous test, for relief is denied only to those appellees now before us whose indictments were not based in part on self-incriminatory statements made before the investigating grand jury without sufficient warning from the court.

In sum, an investigating grand jury presentment is a constitutionally permissible and reasonable alternative to a preliminary hearing. We turn now to a witness's right to the assistance of counsel and privilege against self incrimination during his appearance before an investigating grand jury.

III. RIGHT TO COUNSEL AND RIGHT AGAINST SELF INCRIMINATION BEFORE AN INVESTIGATING GRAND JURY

When the five individual appellees were subpoenaed to testify before the April, 1969, investigating grand jury, each requested the court (SLOANE, J.) that he be permitted to have counsel with him in the grand jury room, or in the alternative that he be allowed to consult with counsel at will outside the door. These motions were properly refused. The court then instructed defendants as to their duties as witnesses. The relevant portions of these instructions are set forth in the margin.[29]

---

[29] The record in this appeal reveals the following:
To Mr. McCloskey:
    "THE COURT: Now, here, too, gentlemen, you are represented by very able counsel, Mr. Gittis. You have a right, each of you—

In his July, 1970, opinions, Judge SPAETH ruled that appellees were entitled under the Fifth and Sixth Amendments to consult with their lawyers outside the

---

both of you—to talk to Mr. Gittis before you go into the Grand Jury room, and you confide in Mr. Gittis after you come out—but with nobody else—not even your wives.

\*     \*     \*     \*     \*     \*     \*

"I have said you have able counsel. You may consult with him or his associate before you go into the Grand Jury room, and after you come out, but not while you are there."

To Mr. Marzullo:

"THE COURT: Mr. Marzullo, I will tell you what, most likely, you just heard when I said it to Mr. Breen. And that is, you certainly have a right to have a lawyer—and you have one, and a good one. You have a right to consult with him before you go into the Grand Jury room, and have questions presented to you and answers made, as indicated by the oath I have just given you. You may tell your lawyer—and nobody else—on the basis of the great tradition of the lawyer-client relationship—what went on in the Grand Jury room—but no one else. And that includes your wife.

"You may not have a lawyer with you while you are in the Grand Jury room."

To Mr. Taylor:

"THE COURT: \* \* \*

"As you may have heard, each one of you has the right to consult a lawyer, counsel, before you go into the Grand Jury room, and to confide in that same counsel after you come out. You may not confide in anyone else excepting your lawyer—not even your wife. I say 'wife' because generally she is the most intimate person that a man knows—when he is married. Otherwise, everything is secret, under the law, under the Grand Jury proceeding."

To Mr. Blatstein:

"THE COURT: \* \* \*

"As you know, Mr. Blatstein, you may consult with your counsel, Mr. Richter, before you go into the Grand Jury room. And you may confide in Mr. Richter when you come out of the Grand Jury room. *While you are in the Grand Jury room, you are in there alone. If there is any problem or question, it will be brought before the court.*" (Emphasis added.)

Mr. Steinberg was administered the oath without any cautionary instructions.

grand jury room during their testimony. He based his ruling on the United States Supreme Court decisions in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) and *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758 (1964), as well as the decision of the New York Court of Appeals in *People v. Ianniello*, 21 N.Y. 2d 418, 235 N.E. 2d 439, cert. denied, 393 U.S. 827, 89 S. Ct. 90 (1968). We cannot agree.

Neither *Escobedo* nor *Miranda* were even remotely concerned with right to counsel before an investigating grand jury. The interpretation urged by appellees that counsel be accessible at all times during a witness's appearance is an unwarranted extension of the teaching of those decisions. As to *Ianniello,* we believe it supports the result we reach today, as appears more fully below.

In *In re Groban's Petition*, 352 U.S. 330, 77 S. Ct. 510 (1957), the last pronouncement by the Supreme Court directly on this issue, it was held that ". . . [a] witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel. . . . When . . . charges are made in a criminal proceeding, he then may demand the presence of his counsel for his defense." Id. at 333, 77 S. Ct. at 513.

It would be a serious interruption and impair continuity in a grand jury investigation if witnesses were permitted to leave the room and consult with counsel prior to responding to every question.

However, in *In re Groban's Petition*, supra, the Supreme Court also stressed that a witness before a grand jury is always protected by the privilege against self incrimination, ". . . a privilege available *in investigations as well as in prosecutions.*" Id. at 333, 77 S. Ct. at 513 (emphasis added). See generally, Annot., Self Incrimination Before a Grand Jury, 38 A.L.R. 2d 229 (1954).

In seeking to balance society's interest in the grand jury's freedom of orderly inquiry and a witness's right to exercise his privilege against self incrimination knowingly and intelligently, we believe that proper procedure is for the court supervising the investigating grand jury to instruct a witness when administering the oath that while he may consult with counsel prior to and after his appearance, he cannot consult with counsel while he is giving testimony. However, the witness should also be informed that should a problem arise while he is being interrogated, or should he be doubtful as to whether he can properly refuse to answer a particular question, the witness can come before the court accompanied by counsel and obtain a ruling as to whether he should answer the question.

Such a warning gives full recognition to the delicate position of a witness before an investigating grand jury.[30] He has been summoned to testify, and he is subject to contempt proceedings should he refuse to testify without justification.[31] The question of when a witness has "reasonable cause to apprehend danger" and hence can exercise his right against self incrimination is not always clear.[32] As was stated in *Jones v. United States,* 342 F. 2d 863 (D.C. Cir. 1964): "If . . . [a witness] answers incriminating questions he may make certain, as Short did, that he will be indicted. And testimony before the grand jury may be used, though Short's was not, to impeach his testimony at trial. If he refuses to testify at all, or to answer some questions on the ground that answers might incriminate him, the grand jury may draw conclusions. If he

---

[30] See generally, Meshbesher, Right to Counsel Before Grand Jury, 41 F.R.D. 189 (1967).

[31] See, e.g., *United States v. Testa,* 326 F. 2d 730 (3d Cir. 1963), cert. denied, 376 U.S. 931, 84 S. Ct. 701 (1964).

[32] See *Malloy v. Hogan,* 378 U.S. 1, 84 S. Ct. 1489 (1964).

refuses to answer questions that are not incriminating, he may be guilty of contempt." Id. at 868 (EDGERTON, J., joined by BAZELON, C. J., and FAHY and WRIGHT, J.J.).[33]

Determining what is an incriminating statement is not always clear to a layman. We thus conclude that a subpoenaed witness who has given testimony before an investigating grand jury without the above warning has been denied his right against self incrimination.

As noted above, appellees urge that the New York Court of Appeals' decision in *People v. Ianniello, supra,* is persuasive authority for the proposition that a witness before an investigating grand jury be allowed to consult with his attorney outside the hearing room after each question. Having examined that decision we find, to the contrary, that it supports the result we reach today.

The holding of that decision was that *Ianniello* in fact had not been deprived of any right to consult with his lawyer. See 21 N.Y. 2d at 421, 235 N.E. 2d at 441. Judge BREITEL then observed that "[c]*ourts* have a particular responsibility to prevent unfairness in Grand Jury proceedings, for the Grand Jury is an 'arm of the Court'". Id. at 424, 288 N.Y.S. 2d at 1468, 235 N.E. 2d at 443 (emphasis added). The court further pertinently noted that if a witness is told he cannot see his lawyer, ". . . he does not have license to commit perjury or contempt. Rather, he must persist in his refusal to answer, thus forcing the prosecutor to take the matter into open court for a ruling. By requiring the matter to be taken to the presiding Justice, the proceeding is expedited and the danger of stalling tactics reduced. The judge can rule on

---

[33] The quoted portion of the opinion, although included in the opinion of the court, was in a section joined in only by four members of the court, which was not a majority.

questions of pertinency, after argument of counsel. He can determine whether a colorable claim of testimonial privilege is presented, and can inform the defendant of the extent of his immunity from prosecution for prior offenses. Where a witness persists in raising objections which are palpably not in good faith, the judge may compel him to desist from this course under the sanctions of contempt proceedings." Id. at 425, 235 N.E. 2d at 443-44.

We reiterate our belief that to allow a witness to leave the grand jury room and consult with his attorney at the door prior to responding to every question would cause undue delay and all but terminate the institution of the investigating grand jury. Such a procedure, which would not be subject to any court supervision, would be an invitation to evasive and stalling tactics. The standards we today institute are manifestly distinguishable in that they require a court to scrutinize the witness's refusal to answer. If the witness persists in interrupting the grand jury proceedings in palpable bad faith and without presenting any colorable claim of testimonial privilege, the court can bring a halt to such tactics. This essential element of judicial supervision would not be available were a witness permitted at will to consult with his attorney for an indefinite period of time after every question, no matter how unmeritorious his objection.

Consequently, we must now consider the proper remedy.[84]

---

[84] The Commonwealth raised the argument that Judge SPAETH being a court of coordinate jurisdiction, was without power to "overrule" Judge SLOANE on the question of preliminary hearings and right to counsel. The cases were assigned to Judge SPAETH for all pre-trial motions. The preliminary hearing issue was never presented to Judge SLOANE, for no presentments or indictments had yet been made. Furthermore, the factual contexts were distinct and the records and posture of the cases were totally different.

## IV. The Proper Remedy

Even though a witness was not given the proper warning, we would not disturb a later indictment unless the presentment and subsequent indictment were based, in part, on the self-incriminatory testimony of the defendant.

In the present case, appellee Blatstein received the proper warning.[35] As to appellee Steinberg, although the record does not indicate whether he was advised he could come before the court during his testimony, our review of the second presentment discloses that it is not based on any testimony that appellee Steinberg might have given,[36] but rather on the records of the Philadelphia Housing Authority, produced under subpoena, evidence submitted by the district attorney's office, and the testimony of Hope B. Winborne, Chief of Construction of the Department of Licenses. Consequently, neither of these appellees is entitled to relief.

However, appellees Thomas Taylor, Paul J. Marzullo and James C. McCloskey were all given an insufficient warning, and their indictments were based on the fourth presentment of the investigating grand jury. Our examination of that presentment discloses that the recommendations concerning each of these appellees were clearly based in part on their incriminating testimony before the investigating grand jury. We therefore conclude that their indictments must be quashed and their testimony suppressed.

The Commonwealth refers us to this Court's decision in *Commonwealth v. Dessus*, supra, and argues that even if some irregularity existed in the procurement of the indictments, to quash is not the proper remedy.

---

[35] See note 29, supra.

[36] The record discloses that Steinberg respectfully declined to give any testimony before the April, 1969, investigating grand jury, other than his name and address.

This Court has made it clear that in certain circumstances, a constitutional violation in securing the indictment will necessitate that the indictment be quashed. In *Commonwealth v. Kilgallen*, 379 Pa. 315, 108 A. 2d 780 (1959), we held that where a witness appeared before the grand jury, testified under judicial compulsion in violation of his rights pursuant to the Fifth Amendment and Article I, Section 9 of the Pennsylvania Constitution against self-incrimination, his indictment should be quashed. Mr. Justice CHIDSEY there stated for six members of the Court that: "It is true, as stated by the Superior Court in the Gross case, that '. . . Proof that a grand jury heard irrelevant testimony, Com. v. Spallone, 154 Pa. Superior Ct. 290, 35 A. 2d 731; or hearsay evidence, Com. v. Stoner, 70 Pa. Superior Ct. 365, affirmed 265 Pa. 139, 108 A. 624; or incompetent witnesses, Com. v. Padden, 160 Pa. Superior Ct. 269, 50 A. 2d 722, will not invalidate an indictment where other proper evidence was adduced before it . . .'. *But we know of no case in this jurisdiction that denies the right to challenge the validity of an indictment on the ground of violation of the accused's constitutional rights here asserted—and so challenge successfully upon proper and sufficient proof.*" Id. at 325-26, 108 A. 2d at 785 (emphasis added).

The principle of *Kilgallen* is still valid and dictates our result today on this issue. Defendants McCloskey, Taylor and Marzullo were on notice that the investigating grand jury was inquiring into the stadium project. They were judicially compelled to testify without sufficient warning or protection concerning their right against self-incrimination. The resulting presentment and indictments were based in part on this constitutionally impermissible testimony and hence must be quashed.

### V. Conclusion

Accordingly, for the reasons set forth above: the orders of the Superior Court affirming the orders of the Philadelphia Court of Common Pleas of July 27, 1970, quashing the indictments against Harry Blatstein, Frank M. Steinberg, McCormick-Taylor Associates, McCloskey & Company, Inc., and H. H. Robertson Company are reversed and the records remanded for further proceedings; the orders of the Superior Court affirming the orders of the Philadelphia Court of Common Pleas of July 27, 1970, quashing indictments and suppressing evidence against James C. McCloskey, Paul J. Marzullo and Thomas Taylor are affirmed.

Mr. Justice COHEN took no part in the decision of this case.

———

### Concurring and Dissenting Opinion by Mr. Justice Eagen:

I agree with the conclusion of the majority that the denial of a preliminary hearing to the individuals and corporations indicted in this case violated neither the Pennsylvania Rules of Criminal Procedure nor constitutional due process. However, I strongly disagree with the majority's ruling that an individual who is compelled to appear and testify before a grand jury may constitutionally be denied the opportunity of consulting with his legal counsel outside the grand jury room during his testimony. I agree completely with Judge SPAETH in the court of original jurisdiction that such a denial violates the individual's rights guaranteed by the Fifth and Sixth Amendments.

A person accused of crime must be afforded the assistance of counsel during every "critical stage" in the prosecution process. Admittedly a witness before a grand jury is not an "accused" in a technical sense. However, the law should consider the realities of the

situation and a reading of the limited record before us is convincing to me that the individuals here involved were "accused" in a very real sense when they testified before the grand jury. Moreover, they were at least potentially defendants; their testimony was compelled and eventually they were indicted at least in part on what they themselves were compelled to disclose. Under such circumstances, they were entitled to the minimum protection of having the opportunity of consultation with counsel before answering any questions.

Additionally, a witness before a grand jury need not answer any incriminating questions. Resolution of the scope of the privilege against self incrimination and the applicability of the waiver doctrine on a question-by-question basis frequently presents a difficult problem. I cannot see how an untrained layman can be expected to possibly discern whether or not an answer to a particular question will subject him to the danger of incrimination. To deny him the opportunity of adequate consultation with his counsel is to render his right under the Fifth Amendment meaningless.

Aside from every other consideration, fundamental fairness, which is the cornerstone of due process, mandates that the opportunity of such assistance be afforded. The secret proceeding before a grand jury is pregnant with the possibility of coercion, intimidation and overreaching. One commentator pointedly described the situation thusly: "A potential defendant who is brought before the Grand Jury without an attorney at his side is almost helpless. He is faced with a barrage of questions, often improper in the normal judicial setting, thrown at him by a group of reasonably intelligent citizens excited at the prospect of playing both lawyer and detective. This torrent of interrogation is, of course, directed by a skilled prosecutor capable of utilizing the Grand Jury as the tool to obtain incriminating evidence from the mouth of a nervous witness. The upset and

confused witness does not know whether to respond to the questions and risk having his answers used against him at a trial or claim the Fifth Amendment, creating suspicion in the eyes of the jurors and risking a contempt charge. In this atmosphere, the proceeding takes on the attributes of a Star Chamber. There is no comparable institution in our entire society which sanctions secret interrogation of a person 'legally' denied access to counsel." Meshbesher, *Right to Counsel Before Grand Jury*, 41 F.R.D. 189, 190 (1966).

Finally, an inconsistency in the reasoning of the majority opinion must be noted. On the one hand, the opinion states that if a witness were permitted to leave the grand jury room to consult with counsel this "would be a serious interruption and impair continuity in a grand jury investigation." But in the next breath the opinion states that if a witness is confronted with a question which tends toward incrimination he may "come before the court and obtain a ruling as to whether or not he should answer the question." Apparently, in the minds of the majority the last mentioned procedure would not constitute a "serious interruption" of the grand jury investigation.

In this connection may I also say that, while I agree that courts and their agencies should persistently strive towards the objective of increased efficiency, such efficiency should always be within legal limits and "should never be made the end goal of a system dealing with life and liberty."

Mr. Justice JONES joins in this opinion.